UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

KEURIG GREEN MOUNTAIN, INC.,
a Delaware corporation,

                                        Plaintiff,

                v.

GLOBAL BARISTAS U.S., LLC,
a Washington limited liability corporation, and
GLOBAL BARISTAS, LLC,                              Case No. 1:18-cv-00095-LAK
a Washington limited liability corporation,

                                        Defendants.

**<u>MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

THE LAW OFFICE OF
RUSSELL D. MORRIS PLLC
Russell D. Morris

545 Fifth Avenue, Suite 640
New York, New York 10017
Tel:  (212) 380-1619

FREDRIKSON & BYRON, P.A.
Cynthia A. Moyer (admitted pro hac vice)
Laura L. Myers (admitted pro hac vice)
Barbara Marchevsky (admitted pro hac vice)

200 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402-1425
Tel:  (612) 492-7000

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 1

I.    Keurig Is A Leader In Specialty Coffee And Single-Cup Coffee Brewers, And It Owns Dozens Of Trade Names And Trademarks Incorporating The Word Tully's. ......... 1

II.   Keurig Licensed The Licensed Marks To Global Baristas. ................................................. 3

III.  Keurig Terminated The Trademark License Agreement Due To Global Baristas' Breaches Thereof. ............................................................................................................... 6

IV.  Global Baristas Continues To Use The Licensed Marks After Expiration Of The 120-Day Wind-Down Period. ............................................................................................. 7

ARGUMENT ....................................................................................................................... 9

I.    Keurig Is Likely To Prevail On The Merits Of Its Claims. ............................................... 9

    A.   Keurig Is Likely To Prevail On The Merits Of Its Trademark Claims Under The Lanham Act. ................................................................................................ 10

    B.   Keurig Is Likely To Prevail On The Merits Of Its Claims For Violation Of The Anti-Cybersquatting Consumer Protection Act ................................................. 15

    C.   Keurig Is Likely To Prevail On The Merits Of Its Breach Of Contract Claim. ........ 16

    D.   Keurig Is Likely To Prevail On The Merits Of Its Claims For Common Law Unfair Competition And Violation Of The Delaware Uniform Deceptive Trade Practices Act .................................................................................................. 18

II.   Keurig Is Suffering And Will Continue To Suffer Irreparable Injury If The Preliminary Injunction Does Not Issue. ............................................................................. 18

III.  Remedies At Law Are Inadequate To Compensate Keurig For That Injury. ................... 21

IV.  The Balance Of Hardships Favors Keurig. ...................................................................... 22

V.    The Public Interest Would Not Be Disserved By The Issuance Of A Preliminary Injunction. ......................................................................................................................... 23

CONCLUSION ................................................................................................................... 24

**Cases**

*7-Eleven Inc. v. Puerto Rico-7 Inc.*,
   No. 3:08-CV-00140-B, 2009 WL 4723199 (M.D. Fla. Apr. 23, 2012)............................ 12, 21

*AIM Int'l Trading, LLC v. Valcucine SpA., IBI LLC*,
   188 F. Supp. 2d 384 (S.D.N.Y. 2002)....................................................................................... 9

*Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*,
   No. 04 Civ. 6107 (DAB), 2006 WL 2289847 (S.D.N.Y. Aug. 8, 2006) ................................ 15

*Allee v. Medrano*,
   416 U.S. 802, 94 S. Ct. 2191 (1974)...................................................................................... 21

*Alpha Recycling, Inc. v. Crosby*,
   No. 14-cv-5015 (JPO), 2016 WL 1178774 (S.D.N.Y. Mar. 23, 2016) ................................... 15

*Audemars Piguet Holding, S.A. v. Swiss Watch Int'l, Inc.*,
   46 F. Supp. 3d 255 (S.D.N.Y. 2014)....................................................................................... 18

*Baker's Aid v. Hussmann Foodservice Co.*,
   830 F.2d 13 (2d Cir. 1987)........................................................................................................ 9

*Baskin-Robbins Franchising LLC v. Morris*,
   No. 10-00758 DAE-BMK, 2011 WL 3734234 (D. Haw. Aug. 23, 2011) ....................... 12, 17

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*,
   333 F. Supp. 2d 239 (D. Del. 2004)........................................................................................ 18

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*,
   794 F.2d 38 (2d Cir. 1986)....................................................................................................... 19

*Coach, Inc. v. Zhen Zhen Weng*,
   No. 13 Civ. 445, 2014 WL 2604032 (S.D.N.Y. June 9, 2014)................................................ 20

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
   604 F.2d 200 (2d Cir. 1979).................................................................................................... 12

*Dress for Success Worldwide v. Dress 4 Success*,
   589 F. Supp. 2d 351 (S.D.N.Y. 2008).................................................................................... 19

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)............................................................................................................. 9, 19

*Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*,
   933 F. Supp. 2d 655 (S.D.N.Y. 2013)............................................................................... 20, 23

*Granny Goose Foods, Inc. v. Bhd. of Teamsters,*
 415 U.S. 423, 94 S. Ct. 1113 (1974) ..................................................... 9

*Gruner + Jahr USA Publ'g v. Meredith Corp.,*
 991 F.2d 1072 (2d Cir. 1993) .............................................................. 10

*Halo Optical Prods., Inc. v. Liberty Sport, Inc.,*
 No. 6:14-cv-00282 (MAD/TWD), 2017 WL 1082443 (N.D.N.Y. Mar. 22, 2017) .......... 12, 13

*Hard Rock Café Int'l (USA) Inc. v. Morton,*
 No. 97 Civ. 9483 (RPP), 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999) .................... 12

*L & L Wings, Inc. v. Marco-Destin, Inc.,*
 676 F. Supp. 2d 179 (S.D.N.Y. 2009) ............................................... 10, 11

*Lee Myles Auto Grp., LLC v. Fiorillo,*
 No. 10 Civ. 6267(PKC), 2010 WL 3466687 (S.D.N.Y. Aug. 25, 2010) ............... 11, 13

*Luxottica Retail N. Am., Inc. v. George L. Haffner Enters., Inc.,*
 No. 8:11-cv-2433-T-23TBM, 2012 WL 1405704 (M.D. Fla. Apr. 23, 2012) .............. 21

*Microban Prods. Co. v. API Indus., Inc.,*
 No. 14 Civ. 41(KPF), 2014 WL 1856471 (S.D.N.Y. May 8, 2014) .............. 13, 14, 20, 22

*Mister Softee, Inc. v. Tsirkos,*
 No. 14 Civ. 1975 (LTS)(RLE), 2014 WL 2535114 (S.D.N.Y. June 5, 2014) ............. 19, 20

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.,*
 704 F. Supp. 2d 305 (S.D.N.Y. 2010) .............................................. 18, 23

*Nespresso USA, Inc. v. Africa Am. Coffee Trading Co.,*
 No. 15-cv-5553-LTS, 2016 WL 3162118 (S.D.N.Y. June 2, 2016) .................... 13, 14

*Northwestern Nat'l Ins. Co. of Milwaukee v. Alberts,*
 937 F.2d 77 (2d Cir. 1991) ................................................................ 21

*NYP Holdings v. N.Y. Post Publ'g Inc.,*
 63 F. Supp. 3d 328 (S.D.N.Y. 2014) ..................................................... 9

*Polaroid Corp. v. Polarad Elecs. Corp.,*
 287 F.2d 492 (2d Cir. 1961) .............................................................. 12

*Ritani, LLC v. Aghjayan,*
 880 F. Supp. 2d 425 (S.D.N.Y. 2012) ................................................... 10

*Rosenthal A.G. v. Ritelite, Ltd.,*
 986 F. Supp. 133 (E.D.N.Y. 1997) ...................................................... 10

*Salinger v. Colting,*
607 F.3d 68 (2d Cir. 2010) .................................................................... 9

*Sanofi-Aventis v. Advancis Pharm. Corp.,*
453 F. Supp. 2d 834 (D. Del. 2006) .................................................... 18

*Savin Corp. v. Savin Grp.,*
391 F.3d 439 (2d Cir. 2004) ................................................................ 14

*Sunward Elecs., Inc. v. McDonald,*
362 F.3d 17 (2d Cir. 2004) .................................................................. 11

*Ticor Title Ins. Co. v. Cohen,*
173 F.3d 63 (2d Cir. 1999) .................................................................. 23

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
505 U.S. 763 (1992) ............................................................................ 11

*U.S. Polo Ass'n v. PRL USA Holdings, Inc.,*
800 F. Supp. 2d 515 (S.D.N.Y. 2011) ............................ 18, 21, 22, 23

*VLIW Tech., LLC v. Hewlett-Packard Co.,*
840 A.2d 606 (Del. 2003) .............................................................. 10, 16

*WPIX, Inc. v. ivi, Inc.,*
691 F.3d 275 (2d Cir. 2012) ................................................................ 22

**Statutes**

15 U.S.C. § 1114 .................................................................................... 9, 10

15 U.S.C. § 1125(a) ............................................................................... 9, 10

15 U.S.C. § 1125(d) ............................................................................. 10, 15

Del. Code Ann. tit. 6, § 2531 ............................................................. 10, 18

# INTRODUCTION

Plaintiff Keurig Green Mountain, Inc. ("Keurig") moves pursuant to Fed. R. Civ. P. 65 for a preliminary injunction against defendants Global Baristas U.S., LLC and Global Baristas, LLC (collectively, "Global Baristas") to stop its former licensee's continued use of the TULLY'S trademarks after the March 30, 2018 expiration of the wind-down period provided under the parties' license agreement. After Keurig terminated the agreement in late 2017, Global Baristas was required to cease all use of the licensed trademarks by March 30, but it has not done so. As a result of Global Baristas' unauthorized trademark use, consumers are highly likely to be confused about the source or sponsorship of Global Baristas' goods. The consumer, the brand, and the brand owner—Keurig—are being irreparably harmed as a result of Global Baristas' conduct. Without injunctive relief, Keurig will continue to lose control over its TULLY'S brand and its reputation and suffer further irreparable harm to its nearly $60 million TULLY'S® coffee business.

# STATEMENT OF FACTS

## I.     Keurig Is A Leader In Specialty Coffee And Single-Cup Coffee Brewers, And It Owns Dozens Of Trade Names And Trademarks Incorporating The Word Tully's.

Keurig is an industry leader in specialty coffee and coffee brewers, recognized for its award-winning coffees and innovative brewing technology. (Declaration of Ben Yoder, dated April 13, 2018 ("Yoder Decl."), ¶ 2.) Keurig markets its KEURIG® brewers and its K-CUP® pods used with its brewers through distributors, retail, and direct channels for use in offices, homes, food service, and hotel rooms in North America and elsewhere. Its K-CUP® pods are produced under a variety of brands, including those owned by Keurig like TULLY'S, and other brands such as STARBUCKS and DUNKIN' DONUTS owned by third parties. (*Id.*)

Keurig owns approximately 85 applications and registrations worldwide for marks incorporating the word Tully's (hereafter, "the TULLY'S Marks"), and many of those marks in the United States are incontestably registered, such as the one to the right. (*Id.* ¶ 3; Dkt. No. 1 ("Compl.") Ex. A.)



In addition, Keurig also owns the business names Tully's, Tully's Roaster of Fine Coffee, and Bellaccino (together with the TULLY'S Marks, "the Licensed Marks"). (Yoder Decl. ¶ 4.)



Keurig uses the TULLY'S Marks for coffee sold in K-Cup® pods used in KEURIG® coffee brewers and on packages for the pods, such as that shown to the right. Keurig also uses the TULLY'S Marks for coffee sold by foodservice providers, like cafeterias, and bagged coffee sold in grocery stores, such as that shown to the right. (*Id.* ¶ 5-6.)



Moreover, under its trademark license agreement with Global Baristas, Keurig authorized the use of the TULLY'S Marks in pre-approved logos used on Licensed Retail Stores and on Promotional and Advertising Material, as shown to the right. (*Id.* ¶ 7.)



TULLY'S branded coffee originated in the Pacific Northwest, where coffee is a way of life. (*Id.* ¶ 8.) TULLY'S branded coffee has been sold since

1992, and it generated nearly $60 million in sales in fiscal 2017.  (*Id.*, ¶¶ 8, 25.)  TULLY'S®
distinctive coffees are known for the slow roasting process used to bring out the richest, fullest
flavor.  (*Id.*)

Keurig carefully creates, curates, and monitors its Licensed Marks and the logos utilizing
the Licensed Marks that are displayed on Promotional and Advertising Material, including
signage on stores.  (*Id.* ¶ 9.)  Keurig counts its Licensed Marks among its most valuable assets
because of the goodwill they represent.  (*Id.*)  These marks and logos identify and distinguish for
customers the particular quality of TULLY'S® coffee products and symbolize the excellent
reputation of Keurig and the TULLY's brand.  (*Id.*)

## II.   Keurig Licensed The Licensed Marks To Global Baristas.

On July 21, 2014, Keurig and Global Baristas entered into a license agreement (the
"Trademark License Agreement"), pursuant to which Keurig licensed the use of the Licensed
Marks to Global Baristas.  (Compl. Ex. A.)

Under the Trademark License Agreement, Keurig granted Global Baristas an exclusive,
non-transferable (except as provided in the Trademark License Agreement) license to last for an
initial term of ten (10) years to use the Licensed Marks to sell TULLY'S coffee (defined as
"Licensed Products" in the Trademark License Agreement) at Licensed Retail Stores (as defined
in the Trademark License Agreement), as well as to maintain a Website
(www.tullyscoffeeshops.com) for the purpose, among others, of providing information to
consumers.  (*Id.* ¶ 2(B)-(E).)  In addition, the Trademark License Agreement granted Global
Baristas a non-exclusive license to make and sell related merchandise bearing the Licensed
Marks (hats, tee shirts, and the like).  (*Id.* ¶ 2(C).)  By the terms of the Trademark License
Agreement, Global Baristas could use the Licensed Marks on or in connection with the Licensed
Products only as provided for in the Trademark License Agreement.

Five provisions of the Trademark License Agreement are of particular relevance here. First, the Trademark License Agreement provided that Keurig retained control over the use and promotion of the TULLY'S Marks. (*Id.* ¶ 8.) In particular, the Trademark License Agreement provided that the "parties acknowledge and agree that Keurig shall have the absolute right to approve [Global Baristas'] use of and manner of use of the Licensed Marks in any Promotional and Advertising Material." (*Id.* ¶ 8(A).) The Agreement defined "Promotional and Advertising Material" to include "labels, packaging, advertising brochures, catalogues and other written or graphic material," as well as "signage, stationary, store and point-of-sale displays, and all other materials upon which any of the Licensed Marks are placed." (*Id.* at 2.)

The Trademark License Agreement required Global Baristas to submit to Keurig and obtain approval for use of all Promotional and Advertising Material used by Global Baristas bearing the Licensed Marks, including modifications of previously approved Promotional and Advertising Material. (*Id.* ¶ 8.) In addition, the Trademark License Agreement stated that Global Baristas could not alter the Licensed Marks, develop derivatives, or new variations of the Licensed Marks, or combine the Licensed Marks with other marks, designs, names, styles, words, or branding, without the prior written consent of Keurig. (*Id.* ¶ 6.) The Trademark License Agreement further allowed Keurig to conduct inspections and audit Global Baristas' activities under the Agreement. (*Id.* ¶ 7(D).)

Second, the Trademark License Agreement required Global Baristas to "prominently display at each Licensed Retail Store a sign stating that (i) Licensee (or its sublicensees) is an independent owner of such Licensed Retail Store operating the Licensed Retail Store under a license from Keurig, (ii) Licensee (or its sublicensees) is not affiliated with Keurig in any other manner, and (iii) Keurig has no interest in the Licensed Retail Store." (*Id.* ¶ 4.)

Third, the Trademark License Agreement allowed Global Baristas to source Licensed Products through suppliers other than Keurig ("Secondary Vendors"), but only with the pre-approval of Keurig and subject to Keurig's quality and service standards. (*Id.* ¶ 10.) If Global Baristas sourced the Licensed Products from a Secondary Vendor, the Agreement required Global Baristas to pay Keurig a royalty fee equal to $250,000 per year (the "Royalty Fee"), starting with the calendar year beginning on January 1, 2016. (*Id.* ¶ 10(D).)

Next, a breach of any of those three provisions would result in termination of the Trademark License Agreement if the breach was not cured within 30 days. (*Id.* ¶ 11(A).) Once terminated, the Trademark License Agreement provided Global Baristas with a 120-day wind-down period to cease all use of the Licensed Marks. (*See id.* ¶ 11(C).) Specifically, upon termination of the Agreement, Global Baristas was required to immediately cease selling any Licensed Products under the Agreement or using any Promotional and Advertising Material, including store signage. (*Id.*) The Agreement provided only one, limited exception to this cessation of use: Global Baristas could sell Licensed Products and use the Promotional and Advertising Material on labels, containers, and packaging as necessary in the ordinary course of business during the 120-day wind-down period. (*Id.*) After 120 days, that exception expired and Global Baristas could "no longer operate any Licensed Retail Stores" and was required to completely stop all use of the Licensed Marks. (*Id.*)

Finally, the parties expressly agreed that "irreparable damage would occur" if "any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached." (*Id.* ¶ 20(H).) Accordingly, the Trademark License Agreement provided that "the parties shall be entitled to apply to a court of competent jurisdiction for an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and

provisions of this Agreement, this being in addition to any other remedy to which they are entitled at law or in equity." (*Id.*)

### III. Keurig Terminated The Trademark License Agreement Due To Global Baristas' Breaches Thereof.

Ignoring the aforementioned provisions of the Trademark License Agreement, Global Baristas chose to use unauthorized logos, such as that shown to the right, on store signage—a category of Promotional and Advertising Material. (Yoder Decl. ¶ 13, 16.)



Global Baristas also used unauthorized logos on other Promotional and Advertising Material, such as those shown to the right. (*Id.* ¶ 14, 16.)

Keurig first became aware of these violations following a 2017 audit of Global Baristas' operations. (*Id.* ¶ 15.) Such audits are expressly permitted under the Trademark License Agreement. (Compl. Ex. A ¶ 7(D).)







Keurig's 2017 audit of Licensed Retail Stores also revealed that Global Baristas is not displaying signage required under the Trademark License Agreement to explain the relationship between Keurig and Global Baristas. (Yoder Decl. ¶ 17.) In particular, none of the audited Licensed Retail Stores displayed signage explaining that Global Baristas (or its sublicensees) is

an independent owner of the Licensed Retail Store operating the store under a license from Keurig; that Global Baristas is not affiliated with Keurig in any other matter; and that Keurig has no interest in the Licensed Retail Store. (*Id.*)

Finally, Global Baristas currently owes Keurig $500,000 in unpaid annual Royalty Fees due under the Trademark License Agreement. (*Id.* ¶ 18.) Keurig invoiced Global Baristas on November 22, 2016, for the 2016 Royalty Fee. (*Id.*; Compl. Ex. B at 4.) That invoice remains unpaid and outstanding. (Yoder Decl. ¶ 18.) Keurig invoiced Global Baristas on February 15, 2017, for the 2017 Royalty Fee. (*Id.*; Compl. Ex. B at 5.) That invoice also remains unpaid and outstanding. (Yoder Decl. ¶ 18.)

On October 27, 2017, Keurig sent Global Baristas a formal notice of breach and demand for payment (the "Notice Letter"), which was delivered on October 30, 2017. (*Id.* ¶ 19; Compl. Ex. B.) The Notice identified as breaches (i) Global Baristas' nonconforming brand, promotional, and marketing uses of the Licensed Marks, including unauthorized use of the Licensed Marks on store signage, and (ii) Global Baristas' failure to pay the Royalty Fees for 2016 and 2017. (Compl. Ex. B.) As required under the Trademark License Agreement, Global Baristas had 30 days to cure all defaults. (Compl. Ex. A ¶ 11(A); Ex. B.) The cure period expired on November 30, 2017. (Yoder Decl. ¶ 20.) To date, Global Baristas has failed to cure any of the defaults and has failed to otherwise respond to Keurig's October 27, 2017 letter. (*Id.*) Therefore, the License Agreement terminated as of December 1, 2017, and the clock started on Global Baristas' 120-day wind-down period. (*Id.* ¶ 21.)

## IV.  Global Baristas Continues To Use The Licensed Marks After Expiration of the 120-Day Wind-Down Period.

Under the terms of the Trademark License Agreement, Global Baristas had until March 30, 2018 to wind-down its business and stop all use of the Licensed Marks. (Compl. Ex. A

¶ 11(C).) After this date, Global Baristas was to cease all use of the Licensed Marks and to "no longer operate any Licensed Retail Stores." (Compl. Ex. A ¶ 11(C).) Nevertheless, Global Baristas continues to use the Licensed Marks at the formerly-licensed stores, continues to use Promotional and Advertising Material with the Licensed Marks, including store signage, and continues to operate the Website.

Keurig's recent investigation confirmed that the Licensed Marks continue to be on display in at least three different formerly-licensed Tully's locations in Seattle, Washington. (Declaration of Gary Vanous, dated April 10, 2018 ("Vanous Decl.").) Two locations visited during Keurig's investigation had a sign on the door indicating that the location was "temporarily closed" due to "unforeseen circumstances." (*Id.* ¶¶ 2-4, Ex. A, Ex. B.) A *U.S. News & World Report* article reported that Tully's store closures were due to lack of coffee as well as rebranding efforts, as opposed to any effort by Global Baristas to comply with the Trademark License Agreement. (*See* Yoder Decl. ¶ 24, Ex. 1 (quoting a spokeswoman as stating that once coffee deliveries resume, "we will need to contact employees to notify them of their next shift (sticking to the existing schedule)") At one of these locations, a notice of eviction was also posted on the door. (Vanous Decl. Ex. B at 2.) Each of the three locations continued to display signage using the Licensed Marks. (*Id.* ¶¶ 2-4, Ex. A, Ex. B, Ex. C.) Moreover, the majority of the store signage constituted unauthorized logos using the Licensed Marks. (*Id.*, Ex. A at 1, Ex. B at 1, Ex. C at 2.) At one of those locations, an additional Licensed Mark inside the closed store was visible through the window from outside the location. (*Id.* ¶ 4, Ex. C at 2.) These three Seattle locations are only representative examples of Global Baristas' continued and unauthorized use of the Licensed Marks.

Finally, Global Baristas' authority under the Trademark License Agreement to operate the Website expired, at the latest, with the expiration of the 120-day wind-down period. (Compl. Ex. A ¶ 2(B)-(E).) Nevertheless, as of the date of the filing of this motion, the Website remains active. (Yoder Decl. ¶ 23.) An injunction is necessary to stop Global Baristas from using the Licensed Marks and prevent further irreparable harm to Keurig.

## ARGUMENT

The Court should enter a preliminary injunction that requires Global Baristas to stop its wrongful use of the Licensed Marks after the expiration of the 120-day wind-down period. Keurig is entitled to a preliminary injunction because (1) it is likely to succeed on the merits; (2) Keurig has suffered and will continue to suffer irreparable injury in the absence of an injunction; (3) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (4) the balance of hardships tips in Keurig's favor; and (5) the "public interest would not be disserved" by the issuance of a preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 (2006)); *NYP Holdings v. N.Y. Post Publ'g Inc.*, 63 F. Supp. 3d 328, 334-35 (S.D.N.Y. 2014) (citing *Salinger* and *eBay* in a trademark infringement case).[1]

## I.     KEURIG IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS.

Keurig's Complaint against Global Baristas sets forth claims for trademark infringement under Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(a); false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); cybersquatting in violation of the Anti-

---

[1] Federal law governs the standard for issuing a preliminary injunction because the case is in federal court, even though state law issues are relevant to Keurig's state law claims. *See AIM Int'l Trading, LLC v. Valcucine SpA., IBI LLC*, 188 F. Supp. 2d 384, 386 n.4 (S.D.N.Y. 2002) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 437, 94 S. Ct. 1113 (1974)); *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987).

Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); deceptive trade practices in violation of Del. Code Ann. tit. 6, § 2531[2]; unfair competition in violation of common law; and breach of contract. Keurig is likely to succeed on the merits on all of its claims.

**A.     Keurig Is Likely To Prevail On The Merits Of Its Trademark Claims Under The Lanham Act.**

Keurig is likely to prevail on its claims under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a)(1)(A), because Global Baristas continues to use the Licensed Marks after expiration of the 120-day wind-down period and to use the Licensed Marks in unauthorized logos on Promotional and Advertising Material, including store signage. Keurig satisfies the *Gruner* two-prong test for a claim of trademark infringement brought under the Lanham Act. *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993) (considering (1) whether the plaintiff's mark is entitled to protection, and (2) whether defendant's use of the mark is likely to cause consumer confusion as to the origin or sponsorship of the defendant's goods); *see also L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 187 (S.D.N.Y. 2009); *Rosenthal A.G. v. Ritelite, Ltd.*, 986 F. Supp. 133, 139 (E.D.N.Y. 1997) (noting that the elements for proving false designation in violation of 15 U.S.C. § 1125(a) are identical to the elements required to prove trademark infringement under 15 U.S.C. § 1114).

With regard to the first prong, to determine if a mark is entitled to protection, the fact that Keurig's trademarks are registered, valid, and inherently distinctive is evidence that they are entitled to protection. *See L & L Wings, Inc.*, 676 F. Supp. 2d at 188 (stating that a Certificate of Registration from the Patent and Trademark Office is prima facie evidence "that the mark is

---

[2] The Trademark License Agreement is governed by Delaware law. (Compl. Ex. A. ¶ 20(H).) The elements of a claim for breach of contract are the same under both Delaware and New York law. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 454 (S.D.N.Y. 2012).

registered and valid (i.e., entitled to protection), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce" (internal quotation omitted)); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (concluding that arbitrary marks are "inherently distinctive and are entitled to protection" under the Lanham Act). Keurig's Certificates of Registration evidence that it is the owner of the Licensed Marks at issue, which include approximately 85 applications and registrations worldwide for marks incorporating the word TULLY'S, as well as the business names incorporating Tully's. Moreover, the TULLY'S marks are strong and inherently distinctive, and therefore are entitled to the protections accorded such marks.

With regard to the second prong examining consumer confusion, Global Baristas' continued use of the Licensed Marks following the expiration of the 120-day wind-down period alone establishes likelihood of confusion. Global Baristas' use of the marks in unauthorized logos—outside the scope of the license agreement—exacerbates that likelihood. In fact, when an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law. *L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188-89 (S.D.N.Y. 2009); *see also Lee Myles Auto Grp., LLC v. Fiorillo*, No. 10 Civ. 6267(PKC), 2010 WL 3466687, at *3 (S.D.N.Y. Aug. 25, 2010). In such situations, confusion is inevitable because consumers have already associated the formerly-licensed infringer with the trademark owner. *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("There is a compelling need for injunctive relief especially when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder.") Similarly, "when a licensee uses a mark beyond the scope permitted in the

licensing agreement, the consumer confusion requirement is satisfied." *Halo Optical Prods., Inc. v. Liberty Sport, Inc.*, No. 6:14-cv-00282 (MAD/TWD), 2017 WL 1082443, at *11 (N.D.N.Y. Mar. 22, 2017); *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."); *Hard Rock Café Int'l (USA) Inc. v. Morton*, No. 97 Civ. 9483 (RPP), 1999 WL 717995, at *29-30 (S.D.N.Y. Sept. 9, 1999) ("[W]eighing in favor of a finding of likelihood of confusion is the fact that infringement occurred as a result of conduct by a licensee beyond the scope of a license agreement. . . . [T]he court finds that confusion is likely, particularly because Hard Rock Hotel is a licensee of HRCI.").[3]

Moreover, Global Baristas' conduct also creates a likelihood of confusion under the traditional *Polaroid* factors. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820 (1961) (looking to (1) the strength of the plaintiff's mark; (2) the similarity of the plaintiff's and defendant's marks; (3) the competitive proximity of the products; (4) the likelihood that plaintiff will "bridge the gap" and offer a product like defendant's; (5) actual confusion between the products; (6) good faith on the defendant's part; (7) the quality of defendant's product; and (8) the sophistication of buyers).

---

[3] Even if Global Baristas has temporarily closed some of the formerly-licensed stores, Global Baristas' continued display of the Licensed Marks at those locations nevertheless creates likelihood of confusion. *See 7-Eleven Inc. v. Puerto Rico-7 Inc.*, No. 3:08-CV-00140-B, 2009 WL 4723199, at *8-9 (M.D. Fla. Apr. 23, 2012) (finding likelihood of confusion where a former licensee continued to operate stores under the licensed trademarks without authorization and the stores the licensee closed continued to display the licensed marks); *see also Baskin-Robbins Franchising LLC v. Morris*, No. 10-00758 DAE-BMK, 2011 WL 3734234, at *7 (D. Haw. Aug. 23, 2011) (same with regard to a former franchisee).

First, as noted above, the Licensed Marks are strong, inherently distinctive marks, and are entitled to the protections accorded such marks. Second, Global Baristas is deliberately continuing to use the same TULLY'S Marks beyond the expiration of the wind-down period and using identical TULLY'S Marks in conjunction with different logo designs without Keurig's consent. *See Halo Optical Prods., Inc.*, 2017 WL 1082443, at *11 n.4. As to the third and fourth factors, Keurig and Global Baristas operate in the same product market: coffee. *See Nespresso USA, Inc. v. Africa Am. Coffee Trading Co.*, No. 15-cv-5553-LTS, 2016 WL 3162118, at *3 (S.D.N.Y. June 2, 2016) (finding the third and fourth factors weigh in favor of a preliminary injunction where the products offered by both Nespresso and Libretto are the same: espresso capsules); *Lee Myles Auto Grp.*, 2010 WL 3466687, at *5 (finding competitive proximity and likelihood that plaintiff will bridge the gap when the plaintiff and defendant— plaintiff's former licensee—operate in the same product market).

Because Global Baristas is using the TULLY'S Marks in the "same or substantially the same product market, actual confusion is a virtual certainty." *Lee Myles Auto Grp., LLC*, 2010 WL 3466687, at *5. The likelihood of confusion is compounded in this case by Global Baristas' previous failure to display the signage required by the Trademark License Agreement explaining the relationship between Global Baristas and Keurig under the Agreement. Global Baristas' use of the Licensed Marks after the expiration of the 120-day wind-down period is highly likely to deceive consumers into believing that Global Baristas is still associated with the TULLY'S brand. *See Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41(KPF), 2014 WL 1856471, at *6 (S.D.N.Y. May 8, 2014) ("That [defendant, an ex-licensee] has not changed its marketing or use of the [plaintiff's] Marks in any way since the termination of the Agreement could lead a consumer to 'conclude that [plaintiff] sponsors and has authorized these products.'") Further,

the quality of the goods, materials, and store signs on which the unauthorized Licensed Marks are used is likely similar to those goods, materials, and signs when authorized, leading to a "greater likelihood of confusion." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir. 2004)

In addition, Global Baristas' lack of good faith is evidenced by its failure to cure the breaches of the Trademark License Agreement or to have otherwise responded to Keurig's October 27, 2017 letter. *See Microban Prods. Co.*, 2014 WL 1856471, at *8 (finding a lack of good faith where defendant displayed an awareness and understanding that it could not continue to use the plaintiff's marks after termination of the agreement, yet persisted to do so anyway). Global Baristas continues to use the Licensed Marks despite the expiration of the 120-day wind-down period, continues to use trademarks it is not authorized to use, and continues to do so after being notified of that unauthorized use. Finally, because coffee and the associated Promotional and Advertising Material are relatively inexpensive goods, the relevant consumer is more likely to be confused by Global Baristas' use of unauthorized logos. *See Nespresso USA, Inc.*, 2016 WL 3162118, at *4 (determining that Nespresso coffee pods are "relatively inexpensive goods" and so consumers may not exercise the same level of care in making purchasing decisions as they would for more expensive purchases "and are therefore more likely to be confused").

In sum, Global Baristas' use establishes a likelihood of consumer confusion under the second prong. Application of this two-pronged test shows that Keurig is likely to prevail on its Lanham Act trademark infringement claims. Keurig's likelihood of success on its Lanham Act claims alone is sufficient to satisfy the first requirement for a preliminary injunction. Nevertheless, as set forth below, Keurig is also likely to succeed on the merits of its other claims.

**B.     Keurig Is Likely To Prevail On The Merits Of Its Claims For Violation Of The Anti-Cybersquatting Consumer Protection Act**

When the Trademark License Agreement terminated, Global Baristas' rights to operate the Website ceased. Yet Global Baristas continues to operate the Website without Keurig's authorization. By doing so, Global Baristas violates the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), ("ACPA"), which provides in pertinent part that a party is liable to the owner of a mark if the it (i) has a bad faith intent to profit from the mark and (ii) registers, traffics in, or uses a domain name that (in the case of a mark that is either distinctive or famous at the time the defendant's domain name is registered) is identical or confusingly similar to or dilutive of that mark. *See* 15 U.S.C. § 1125(d)(1)(A); *Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, No. 04 Civ. 6107 (DAB), 2006 WL 2289847, at *13 (S.D.N.Y. Aug. 8, 2006). The ACPA lists nine non-exclusive factors to consider in determining whether a defendant's use was in bad faith, including the defendant's "intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for *commercial gain* or with the intent to tarnish or disparage the mark, *by creating a likelihood of confusion as to the source, sponsorship,* affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(i)(V) (emphasis added); *see also von Thurn und Taxis*, 2006 WL 2289847, at *13-14.

Here, Keurig's registered Licensed Marks are presumed to be distinctive. *See Alpha Recycling, Inc. v. Crosby*, No. 14-cv-5015 (JPO), 2016 WL 1178774, at *3 (S.D.N.Y. Mar. 23, 2016). Global Baristas is continuing to operate the Website, that is "identical or confusingly similar to or dilutive of th[ose] mark[s]," and with the bad faith intent to profit from the marks by diverting traffic to the unauthorized Website for commercial gain. This conduct constitutes a violation of the ACPA and, accordingly, Keurig has shown a likelihood of success on this claim.

**C.      Keurig Is Likely To Prevail On The Merits Of Its Breach Of Contract Claim.**

In its Complaint, Keurig asserts a breach of contract claim with respect to the Trademark License Agreement. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (stating the elements for breach of contract under Delaware law as (1) the existence of a contract, (2) breach of an obligation imposed by that contract, and (3) resultant damage to the plaintiff). Keurig will prevail on the merits of its breach of contract claim because Global Baristas has breached the Trademark License Agreement in at least four different ways.

First, Global Baristas breached Sections 6 and 8(B)-(C) of the Trademark Agreement by using the Licensed Marks in unauthorized logos on Promotional and Advertising Material, including store signage. As described above, under Section 6 of the Agreement, Global Baristas was prohibited from altering the Licensed Marks, developing derivatives or new variations of the Licensed Marks, or combining the Licensed Marks with other marks, designs, names, styles, words, or branding, without the prior written consent of Keurig. Further, under Section 8, Global Baristas was required to submit to Keurig and obtain approval for use of all Promotional and Advertising Material used by Global Baristas bearing the Licensed Marks. (Compl. Ex. A ¶ 8.) Global Baristas has been using the Licensed Marks in unauthorized logos on Promotional and Advertising Material, including store signage, in violation of these sections of the Trademark License Agreement. (Yoder Decl. ¶¶ 13-16.)

Second, Global Baristas breached Section 4(A) by failing to "prominently display at each Licensed Retail Store a sign stating (i) Licensee (or its sublicensees) is an independent owner of such Licensed Retail Store operating the Licensed Retail Store under a license from Keurig, (ii) Licensee (or its sublicensees) is not affiliated with Keurig in any other manner, and (iii) Keurig has no interest in the Licensed Retail Store." Keurig's 2017 audit of Global Baristas'

operations revealed that none of the audited Licensed Retail Stores displayed such signage. (Yoder Decl. ¶ 17.)

Third, Global Baristas breached Section 10 of the Trademark License Agreement by failing to pay Keurig the required annual Royalty Fees for 2016 and 2017. (Yoder Decl. ¶ 18.) Global Baristas currently owes Keurig a total of $500,000 in past-due Royalty Fees. (*Id.*)

Finally, Global Baristas breached Section 11 of the Trademark License Agreement by continuing to use Promotional and Advertising Material, including store signage, at formerly-licensed stores, and continuing to operate the Website even after expiration of the 120-day wind-down period. (*See* Vanous Decl. ¶¶ 2-4, Exs. A-C; Yoder Decl. ¶ 23); *cf. Baskin-Robbs Franchising LLC*, 2011 WL 3734234, at *4-5 (finding a breach of contract where a former franchisee failed to de-identify an abandoned store by removing the licensed trademarks upon termination of the franchise agreement, as required by the agreement). These breaches have damaged Keurig monetarily and with respect to the reputation of the TULLY'S brand. Thus, Keurig is likely to prevail on its breach of contract claim.[4]

---

[4] Global Baristas' inability to even respond to Keurig's October 2017 notice of Global Baristas' breaches of the Trademark License Agreement evidences its inability to challenge Keurig's position. Global Baristas' attempt to conjure up litigation-based defenses by asserting meritless counterclaims for breach of contract, fraud, and a violation of Washington's Franchise Investment Protection Act do not affect Keurig's likelihood of success on its breach of contract claim. (*See* Dkt. No. 22 at 11-13.) Global Baristas' counterclaims are baseless as a matter of law and are currently the subject of Keurig's Motion to Dismiss Defendant's Counterclaims for failure to state a claim upon which relief can be granted. (*See* Dkt. No. 27.) Nevertheless, even if these counterclaims are sufficient as a defense against Keurig's breach of contract claim, Keurig's claims for violation of the Lanham Act and related state and common laws are a sufficient basis for injunctive relief.

**D. Keurig Is Likely To Prevail On The Merits Of Its Claims For Common Law Unfair Competition And Violation Of The Delaware Uniform Deceptive Trade Practices Act.**

Claims for trademark infringement, false designation of origin, statutory unfair competition pursuant to the Delaware Uniform Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2531 et seq., and common law unfair competition are all governed by the same standard as trademark infringement claims under the Lanham Act. *See Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 847 n.2 (D. Del. 2006) (citing *Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 333 F. Supp. 2d 239, 244 (D. Del. 2004), *aff'd*, 432 F.3d 463 (3d Cir. 2005)). Accordingly, for the reasons set forth above with respect to Keurig's Lanham Act claims, Keurig is also likely to prevail on its claims for unfair competition under common law and under the Delaware Uniform Deceptive Trade Practices Act.

Because Keurig is likely to succeed on the merits of all of its claims, the first requirement for a preliminary injunction is satisfied.

**II. KEURIG IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY IF THE PRELIMINARY INJUNCTION DOES NOT ISSUE.**

Irreparable harm exists in a trademark case "when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *Audemars Piguet Holding, S.A. v. Swiss Watch Int'l, Inc.*, 46 F. Supp. 3d 255, 287 (S.D.N.Y. 2014), *rev'd in part on rehearing on other grounds*, 2015 WL 150756 (S.D.N.Y. 2015) (citing *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010)); s*ee also U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011) (same and finding irreparable harm because "the reputation and goodwill of the PRL Parties[] will not be in PRL's control").

As a former licensee, Global Baristas' continued use of the Licensed Marks will cause Keurig to lose control over the reputation of its valuable TULLY's Marks. Indeed, it is well-established that "[i]n the context of a dispute between a licensor and licensee of a trademark, a finding of irreparable harm is **_automatic_** once the movant demonstrates unlawful use and consumer confusion." *Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 363 (S.D.N.Y. 2008) (citing *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986)) (emphasis added). As the Second Circuit explained in *Church of Scientology International*, irreparable harm is readily found in this context because the "unauthorized use of a mark by a former licensee invariably threatens injury to the economic value and reputation associated with a licensor's mark" as a result of the licensor's lack of control of the trademarks. 794 F.2d at 43 ("A trademark licensor has a particular interest in controlling the use of its mark by its licensees in order to preserve the mark's quality and its continued vitality."). As set forth above, Global Baristas' continued use of the Licensed Marks is unlawful and likely to cause consumer confusion. Therefore, irreparable harm to Keurig is axiomatic.

This reasoning has survived the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 (2006). Post-*eBay*, this Court determined that irreparable harm was established in an analogous context. *See Mister Softee, Inc. v. Tsirkos*, No. 14 Civ. 1975 (LTS)(RLE), 2014 WL 2535114, at *10 (S.D.N.Y. June 5, 2014). After the parties' trademark agreement terminated, the court reasoned that customers were likely to believe that the plaintiff continued to be responsible for the quality of the defendant's products and services. *Id.* As a result, the plaintiff's "reputation[] will be irreparably injured as a result of Defendants continued use of confusing marks if the quality falls

below [plaintiff's] standards." *Id.* Here, because the Trademark License Agreement has terminated, Keurig can no longer ensure that Global Baristas is selling products that meet Keurig's quality control standards. Customers, however, likely have no idea that the relationship has changed. As a result, customers are likely to believe that Keurig, as owner of the TULLY'S brand, remains responsible for the quality of Global Baristas' products, putting Keurig's reputation at risk.

Courts consistently find irreparable harm under these facts—where consumer confusion is likely as to the source of sponsorship of goods, particularly in the context of a terminated license. *See, e.g.*, *Coach, Inc. v. Zhen Zhen Weng*, No. 13 Civ. 445, 2014 WL 2604032, at *21 (S.D.N.Y. June 9, 2014) (concluding that "irreparable injury is established where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question" (citation and internal quotation marks omitted)); *Microban Prods. Co.*, 2014 WL 1856471, at *8 (finding irreparable harm from an ex-licensee's continued use of a trademark after the license expires because such continued use is "likely to cause consumer confusion" and "the potential for damage to [plaintiff's] reputation and goodwill is out of its control"). Because of Global Baristas' continued use of the Licensed Marks after the expiration of the 120-day wind-down period, Keurig has suffered and will continue to suffer irreparable harm absent an injunction.

The "temporary" closure of some of the formerly-licensed stores uncovered by Keurig's investigation does not weigh against a finding of irreparable harm. As an initial matter, there is no guarantee without a preliminary injunction that Global Baristas will not reopen these formerly-licensed stores and continue to operate them under the Licensed Marks without authority. *See Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 661

(S.D.N.Y. 2013) ("It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise defendants would be free to return to (their) old ways." (quoting *Allee v. Medrano*, 416 U.S. 802, 810-11, 94 S. Ct. 2191 (1974))). The risk that Global Baristas will reopen these formerly-licensed stores is particularly high where it is the company's stated agenda to reopen. (*See* Yoder Decl. ¶ 24, Ex. 2.)

Moreover, the fact that the temporarily-closed stores continue to display the Licensed Marks establishes irreparable harm because Keurig cannot "control its own reputation and goodwill." *7-Eleven Inc.*, 2009 WL 4723199, at *9 (citation and internal quotation marks omitted); *see also Luxottica Retail N. Am., Inc. v. George L. Haffner Enters., Inc.*, No. 8:11-cv-2433-T-23TBM, 2012 WL 1405704 (M.D. Fla. Apr. 23, 2012) (granting a permanent injunction and ordering a former franchisee to remove signage bearing the plaintiff's licensed trademarks left outside the former franchisee's abandoned store).

Global Baristas' continued use of the Licensed Marks is causing Keurig to lose control over its Licensed Marks and leads to confusion as to the source or sponsorship of Global Baristas' goods. Global Baristas' actions have caused and will continue to cause irreparable harm absent an injunction.

## III. REMEDIES AT LAW ARE INADEQUATE TO COMPENSATE KEURIG FOR THAT INJURY.

If an injunction is not granted, Keurig will lose control over the Licensed Marks and suffer a resulting loss of reputation and goodwill. "Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law cannot adequately compensate Plaintiff for its injuries." *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 (citing *Northwestern Nat'l Ins. Co. of Milwaukee v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991)). Indeed,

the loss of reputation and goodwill to the TULLY'S brand is wholly "unknown." *See Microban Prods. Co.*, 2014 WL 1856471, at *21. In addition, the "unlikelihood that defendant . . . would, in any event, be able to satisfy a substantial damage award" further supports a finding that monetary damages would be insufficient to remedy the harms. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2d Cir. 2012) (internal quotation marks omitted).

Global Baristas continues to use the Licensed Marks after the expiration of 120-day wind-down period, including in unauthorized logos on Promotional and Advertising Material, such as store signage. Absent injunctive relief, Keurig will face customer confusion and suffer a loss of reputation, which cannot be repaired through remedies at law. Further, Global Baristas' failure to pay its overdue Royalty Fees for 2016 and 2017 suggests that it may not be capable of satisfying a damages award. Therefore, this factor weighs heavily in favor of equitable relief.

## IV.    THE BALANCE OF HARDSHIPS FAVORS KEURIG.

The balance of harms that would follow if an injunction were granted or denied decidedly tips in Keurig's favor. Coffee has been sold under the Licensed Marks for many years. Keurig has developed and maintained the Licensed Marks to signal the consistent and high quality of its products. To that end, Keurig has multiple registered trademarks for use on authorized coffee products and Promotional and Advertising Material. The likelihood of customer confusion and potential loss to Keurig from Global Baristas' unlawful use, both in terms of sales and reputation, threaten to cause Keurig serious harm. *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 541; *see also Microban Prods Co.*, 2014 WL 1856471, at *22 (determining that the balance of the equities weighs in favor of a preliminary injunction where the plaintiff derives substantial revenue from manufacturing a product and licensing use of the related trademarks to sellers such that "allowing [defendant] to misappropriate [plaintiff's] Marks would indeed 'undermine [plaintiff's] business, and create a windfall to [defendant]'").

In contrast, Global Baristas' interest in using the Licensed Marks in any way has ended because of the expiration of the 120-day wind-down period following the termination of the Trademark License Agreement. Further, Global Baristas' interest in selling coffee and Promotional and Advertising Material using unauthorized logos never had a basis in the Trademark License Agreement. Finally, injunctive relief is in accordance with the parties' negotiated-for expectations. (*See* Compl. Ex. A ¶ 20(H).) As noted in the Statement of Facts, the Trademark License Agreement explicitly provides for injunctive relief in the event of violations. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (finding irreparable harm in part because the parties' agreement provided for the entry of injunctive relief in the event of a breach); *Fresh Del Monte Produce Inc.*, 933 F. Supp. 2d at 664 (concluding that an injunction is warranted, "especially in light of [defendant's] acknowledgement in the License Agreement itself that any breach would result in irreparable harm"). Under these circumstances, the balance of hardships tips in favor of Keurig.

## V. THE PUBLIC INTEREST WOULD NOT BE DISSERVED BY THE ISSUANCE OF A PRELIMINARY INJUNCTION.

The public interest would be served by the issuance of a preliminary injunction. "The public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 345; *see also U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 541 ("The consuming public has a protectable interest in being free from confusion, deception and mistake.").

Global Baristas continues to use the Licensed Marks without authorization on Promotional and Advertising Material, including store signage, despite the expiration of the 120-day wind-down period. Through its wrongful use, Global Baristas is confusing the public and

harming the TULLY'S brand. Keurig therefore asks the Court to enjoin Global Baristas from engaging in these unauthorized activities.

## CONCLUSION

For the foregoing reasons, Keurig respectfully requests that the Court grant its motion for a preliminary injunction.

Dated: New York, NY          Respectfully submitted,
       April 13, 2018

By: _____
    Russell D. Morris
    **THE LAW OFFICE OF RUSSELL D. MORRIS PLLC**
    545 Fifth Avenue, Suite 640
    New York, New York 10017
    Tel: (212) 380-1619
    rmorris@russellmorrislaw.com

    and

    Cynthia A. Moyer (admitted *pro hac vice*)
    Laura L. Myers (admitted *pro hac vice*)
    Barbara Marchevsky (admitted *pro hac vice*)
    **FREDRIKSON & BYRON, P.A.**
    200 South Sixth Street, Suite 4000
    Minneapolis, Minnesota 55402-1425
    Telephone: (612) 492-7000
    Facsimile: (612) 492-7077
    E-mail: cmoyer@fredlaw.com
    lmyers@fredlaw.com
    bmarchevsky@fredlaw.com

    *Attorneys for Plaintiff Keurig Green Mountain, Inc.*

62985164